**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| | * | |
| | * | |
| | * | |
| **v.** | * | **Criminal Case No.: SAG-22-409** |
| | * | |
| **WILSON ARTURO** | * | |
| **CONSTANZA-GALDOMEZ,** | * | |
| **EDIS OMAR** | * | |
| **VALENZUELA-RODRIGUEZ,** | * | |
| **and JONATHAN PESQUERA-PUERTO** | * | |
| | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**MEMORANDUM OPINION**</u>

For over two years, the government and Defendants Wilson Arturo Constanza-Galdomez, Edis Omar Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto have diligently prepared for the non-capital trial set to begin on September 2, 2025. From its inception, this has not been a death penalty case: the Indictment, ECF 1, includes no death-eligible counts. And on April 22, 2024, the government assured the Defendants and this Court, in writing, that it would not seek the death penalty. Every party to this case—this Court included—has relied on the government's direct and indirect representations that this was *not* a death penalty case in preparing for the racketeering conspiracy trial set to begin weeks from now. At that trial, each of the three Defendants faces a charge that could result in a sentence of life in prison.

But the government changed its mind. Just twenty weeks before this long-scheduled trial, the government informed this Court that the Department of Justice was reconsidering its decision not to seek the death penalty. The Department of Justice's Capital Case Section held a meeting in Washington, D.C. on April 23, 2025. The government then filed a Superseding Indictment on May 8, 2025, adding new death-eligible counts and special findings. ECF 90. On May 16, 2025, 109

days before trial, the government filed a notice of its intent to seek the death penalty as to each Defendant. ECF 94, 95, 96. Mr. Constanza-Galdomez moved to strike the notice. ECF 101. Mr. Valenzuela-Rodriguez and Mr. Pesquera-Puerto joined the motion. ECF 105, 106. The government opposed, ECF 126, and Mr. Constanza-Galdomez replied, ECF 127. Mr. Valenzuela-Rodriguez moved to join in the reply, ECF 129. The parties have agreed no evidentiary hearing is necessary.

This dispute is about due process. To be clear, the Executive is entitled to charge cases as it sees fit, and Congress has authorized the Department of Justice to seek the death penalty in qualifying cases. But "[w]hen a defendant's life is at stake," courts are required to be "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). That is because "the penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The Founders recognized as much by distinguishing between deprivations of life, liberty, and property in the Due Process Clause of the Fifth Amendment. Congress has accordingly specified procedures for capital cases, set apart from other criminal cases, since the Judiciary Act of 1789. The modern form of those procedures, the Federal Death Penalty Act of 1994, Pub. L. 103-322, title VI, provides defendants, *inter alia*, the right to counsel "learned in the law of capital cases," the right to reasonable notice of the government's intent to seek the death penalty, and the right to present mitigating evidence.

Practically speaking, this means that death penalty trials operate very differently from ordinary criminal trials. From the moment a person is charged with a death-eligible offense, he is entitled to two court-appointed attorneys (including one learned counsel). Those counsel prepare a mitigation case in efforts to persuade the government not to seek the death penalty. Preparing a mitigation case, even for use in those initial pre-authorization stages, requires a complete investigation of the defendant's life circumstances and generally involves hiring mitigation

experts. In cases like this one, involving foreign-born defendants, the mitigation team generally must travel to the defendant's country of origin to conduct interviews with his friends and family.

If the Capital Case Section decides to authorize the USAO to seek the death penalty after the mitigation presentations and the case proceeds to trial, the trial has two stages—a guilt phase and a sentencing phase. The same jury must assess whether the defendant is guilty of the charged crime, and then whether the death penalty is warranted. During the sentencing phase, the jury considers the aggravating factors that the government must prove and any mitigating evidence the defense wishes to present. Evidence from the guilt phase of the trial is important to the government and defense cases at the sentencing phase because counsel present an "integrated defense." Before trial even begins, selecting a jury in a capital case often takes several months. The parties agree on a written questionnaire (with Court input and approval) to be mailed to a large jury pool, written responses are carefully vetted by the parties (and often jury consultants who specialize in capital cases), and jurors are brought before the Court for intensive individual voir dire before a panel is selected.

These stringent procedures are not hollow gestures designed to manufacture the appearance of justice; they are there to ensure our justice system gets it right where the government is seeking a drastic and final penalty. The question before this Court is whether the government's belated notices of its intent to seek the death penalty comport with Defendants' constitutional and statutory rights. The answer is emphatically no. This Court will not "give its imprimatur to the creation of an entirely new regime for the administration of the death penalty" that ignores "longstanding norms and practices." ECF 127 at 2. The government has proceeded hastily in this case, and in doing so has leapfrogged important constitutional and statutory rights. That is unacceptable. The death notices in this case are untimely and incurably defective. This Court will accordingly grant

the motion to strike the death notices. Defendants' long-scheduled non-capital trial will begin on September 2, 2025.

## I.    BACKGROUND

### 1.    Alleged Offense Conduct

The government alleges that the Defendants committed multiple violent acts in 2020 as part of a racketeering enterprise. ECF 90. Defendants were allegedly involved in two murders (of Victim 3 and Victim 4), three other attempted murders, a serious assault, and distributing marijuana, cocaine, and fentanyl in the Spring of 2020. *Id.* The government alleges that Defendants, who are Salvadorian and Honduran nationals present in the United States unlawfully, undertook these activities as members of La Mara Salvatrucha, more commonly known as MS-13. *Id.*

### 2.    Procedural Background

Defendants were arrested on state charges in June, 2020 and detained without bond. ECF 87, 88. The Federal Bureau of Investigation ("FBI") was involved in the case from its inception, and noted in a June 12, 2020 memorandum that federal jurisdiction likely existed because the murders were connected with the Defendants' alleged membership in MS-13. ECF 101-1. The June 12 memorandum indicated that the FBI would work with the U.S. Attorney's Office ("USAO') in Maryland to charge Defendants with a RICO conspiracy.[1]

A federal grand jury indicted Defendants on November 20, 2022. ECF 1. The Indictment charged Defendants with a single count of Conspiracy to Participate in a Racketeering Enterprise

---

[1] A racketeering ("RICO") conspiracy is an agreement between two or more people to engage in a pattern of illegal activities with the goal of obtaining a commercial profit. 18 U.S.C. § 1961. Examples of racketeering activity include fraud, extortion, bribery, threats, violence, money laundering, and drug trafficking. *Id.*

in violation of 18 U.S.C. § 1962(d) and provided notice that the United States would seek forfeiture as part of any potential sentence. *Id.* The Indictment listed the murders of Victim 3 and Victim 4 as racketeering acts and overt acts of the conspiracy. Because the maximum penalty for the only charged offense is life in prison, the Indictment did not include any death-eligible count. *See* 18 U.S.C. § 1959(a)(1).

Each Defendant was transported from state pretrial detention and appeared before a United States Magistrate Judge on December 7, 2022. At that time, each Defendant was detained federally by agreement. ECF 11, 14, 16, 17, 20, 21. The Court appointed counsel for each Defendant. ECF 8, 9, 10. No Defendant was provided a second attorney, or any attorney who is "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Of course, at that time, the Defendants did not have any right to learned counsel because they were not charged with any death-eligible offenses.

Because the indictment alleged "conduct that could be, but [was] not, charged as a capital offense," Department of Justice internal procedures required the USAO to notify the Capital Case Section ("CCS") as early as possible. *See* Justice Manual § 9-10.180. The USAO notified CCS, and Attorney General Merrick Garland endorsed the USAO's decisions neither to charge death-eligible counts nor to seek the death penalty. On April 22, 2024, the government filed correspondence indicating that the Attorney General had directed the USAO not to seek the death penalty against any defendant in this case. ECF 50.

During the pendency of this case, the government filed, and this Court granted, eight motions to exclude time under the Speedy Trial Act. ECF 27, 31, 34, 46, 49, 51, 59, 66; ECF 28, 32, 35, 47, 50, 52, 60, 67. Defense counsel would not have consented to the motions had they known it was possible that the government would revisit its decision not to seek the death penalty. ECF 101-3. In September, 2024, at the request of all parties, this Court scheduled a four-week jury

trial to begin on September 2, 2025. ECF 61. The trial date had to be scheduled well in advance to accommodate the schedules of all counsel in selecting a four-week window.

Plea negotiations were slow but ongoing until the change in administration in early 2025. ECF 101-2 ¶¶ 4, 7–9; ECF 105-1 ¶¶ 3–4; ECF 106-1. The government's productions of discovery were delayed, with the second coming in August, 2024. ECF 101-2 ¶ 5. The government never extended formal plea offers, although Mr. Constanza-Galdomez requested an offer for a Rule 11(c)(1)(C) plea in January, 2025. ECF 101-2; ECF 105-1. Counsel for Mr. Constanza-Galdomez attests that she "did not believe there was substantial urgency in resolving the case with a plea when the maximum sentence the client faced was life imprisonment and the plea offer that [she] anticipated would the range of 30 to 40 or so years." ECF 101-2 ¶ 8. Counsel would have been more proactive in seeking plea agreements had they known that the government would renege on its promise not to seek the death penalty. ECF 105-1 ¶ 11 ("Had I been advised, in April, 2024, or anytime thereafter prior to May 8, 2025 that the Government intended to seek my client's death in this case, I would have taken much different steps in an attempt to resolve this matter short of the death penalty."); ECF 101-2 ¶ 13 ("If, in mid-2024, I would have believed that the April 2024 no-seek decision would be reversed by Main Justice depending on the results of the November 2024 election, I would have acted with more speed and urgency and devoted whatever time was needed to hold as many meetings with the client as necessary to advise him to accept the type of plea offer that I believe AUSA Smolkin eventually would have offered with further negotiation."); ECF 106-1 ¶ 9 ("Had I any inclination in mid-2024 that the Department of Justice would reverse their April 2024 no-seek decision I would have worked with far more resolve and exigency to resolve this matter with a plea agreement. I would have counseled Mr. Pesquera-Puerto to accept a plea in the

range of years as Mr. Smolkin and I had discussed, and as I believe could have been accomplished.").

    3.  <u>Executive Order and Department of Justice Memorandum</u>

On January 20, 2025, President Trump signed Executive Order 14164, Restoring the Death Penalty, 90 C.F.R. 4463. Section 3 of the Order directs the Attorney General to "pursue the death penalty for all crimes of a severity demanding its use" and "pursue Federal jurisdiction and seek the death penalty regardless of other factors for every federal capital crime involving…A capital crime committed by an alien illegally present in this country." *Id.*

On February 5, 2025, Attorney General Pamela Bondi issued a memorandum to all Department of Justice employees to outline the Department's agenda to "reviv[e] the federal death penalty and lift[] the moratorium on federal executions" to implement E.O. 14164. *See* Memorandum from P. Bondi: *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions*, Dep't of Justice (Feb. 5, 2025). Attorney General Bondi directed the Capital Review Committee ("CRC") to review no-seek decisions in all pending death-eligible cases charged between January 20, 2021 and January 19, 2024. The CRC was instructed to pay "[p]articular attention" to "cases involving defendants associated with cartels or transnational criminal organizations [and] capital crimes committed by defendants present in the United States illegally." *Id.* The memorandum also provided, "Absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving…capital crimes committed by aliens who are illegally present in the United States." *Id.* The memorandum referred to unlawful immigration status as an "aggravating circumstance[]." *Id.* (citing 18 U.S.C. §§ 3592(c)–(d)).

4.   Reopening of Capital Review and Reversal of Position

On April 2, 2025, just five days before Defendants were due to file their substantive motions pursuant to the scheduling order, the government informed this Court that "the prosecution team was advised by a member of the Department of Justice's Capital Case Section (CCS) that The Attorney General's Capital Review Committee has selected defendants Wilson Costanza-Galdomez [*sic*], Edis Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto for further evaluation." ECF 73. This Court held a status teleconference the following day, during which it advised the government of its obligation to provide reasonable notice of its intent to seek the death penalty under *United States v. Ferebe*, and 18 U.S.C. § 3593(a). ECF 74. The Court also reminded the government of the Defendants' rights to learned counsel, and that it anticipated considerable difficulty in identifying three learned counsel available for the September 2, 2025 trial date. To begin the process as soon as possible, the Court directed the government to confirm whether the CCS intended to proceed with revisiting its prior no-seek decision. On April 4, 2025, the government confirmed that DOJ would continue with renewed capital review. ECF 75.

Again, the Court reminded the government of the Defendants' rights to learned counsel, which apply—and are especially significant—during capital review proceedings. ECF 76. On April 11, defense counsel jointly filed an objection to DOJ's reopening of capital review. ECF 101-3. In the letter, counsel asserted their clients' objection to proceeding to capital review without learned counsel, and noted that they had relied on the government's representations about the death penalty in nearly every aspect of their case preparation. *Id.* ("This case has been non-capital since the return of the indictment almost three years ago, and this fact was reinforced by the Government in its notice not to seek the death penalty. It has been treated as such by all counsel, all the accused, the Government, and the Honorable Stephanie Gallagher. The Defense has relied on the indictment

and the representations of the Government in its trial preparation, pretrial motion litigation, investigation, expert assistance, plea negotiations, and client advice."). Defense counsel voiced the same concerns at their meeting with the CRC on April 23, 2025. ECF 101 at 10. At the time of the CRC meeting, there still were not any death-eligible counts in the case, which still had just a one-count conspiracy indictment. The Defendants did not have learned counsel, nor did their existing counsel have the time, resources, or notice (through a Superseding Indictment) necessary to prepare a proper mitigation case.

A grand jury returned a Superseding Indictment on May 8, 2025. ECF 90. The Superseding Indictment added two counts of murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a), and special findings relating to both murder counts. *Id.* The Superseding Indictment did not add any new factual allegations of criminal activity.

On May 12, 2025, this Court set a deadline of May 16, 2025 for the government to file notices if it intended to contravene its prior representations that it would not seek the death penalty. ECF 93. The Court reiterated that the trial date of September 2, 2025, is "fixed." *Id.* The government filed notices of its intent to seek the death penalty as to all three Defendants on May 16, 2025. ECF 94, 95, 96. The Court appointed a second lawyer, Brent Newton, Esq., to assist Mr. Constanza-Galdomez in preparing briefing on this issue. Mr. Newton is not learned counsel. Mr. Constanza-Galdomez now has two counsel, neither of whom is learned counsel, and the other two Defendants each have one counsel, who is not learned counsel. The government is represented by five prosecutors.

## II.  DISCUSSION

### 1.  Timeliness of Notice

The Federal Death Penalty Act, 18 U.S.C. § 3593,"guarantees defendants that they will not be tried for their lives without lawful notice." *United States v. Ferebe*, 332 F.3d 722, 731 (4th Cir. 2003).

> If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial or before acceptance by the court of a plea of guilty*, sign and file with the court, and serve on the defendant, a notice—
>
> (1) Stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted under this chapter and that the government will seek the sentence of death; and
> (2) Setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a) (emphasis added). The purpose of the FDPA is to "protect the accused from having to endure a trial for his life for which he was not on reasonable notice." *Ferebe*, 332 F.3d at 722. Like an indictment, a death notice "protect[s] the fundamental fairness of [the] proceeding[]" and "serve[s] to set defendants on notice so that they can adequately prepare to defend themselves." *Id.* at 736.

The FDPA accordingly requires a "pretrial inquiry into the objective reasonableness of the notice provided." *Id.* at 731. "Because an accused is assured by section 3593(a) that, a reasonable time before trial, he will receive adequate notice that he is to be tried for capital offense, and consequently that he will not be required to stand trial for such offense absent that notice, *his rights are denied at the point when he proceeds toward trial*, or actually to trial, in the absence of a reasonable time between his receipt of the Death Notice and his capital trial." *Id.* at 732 (emphasis

added). A defendant's rights are violated regardless of whether he was actually "prejudiced by an unreasonably delayed Death Notice." *Id.* The sole remedy for an "objectively unreasonable" death notice is to strike it. *Id.* at 731.

The Fourth Circuit outlined four non-exhaustive factors for considering the timeliness of a death notice in *Ferebe*: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and (4) the status of discovery in the proceedings." *Id.* at 737.

This is an unusual case. *Ferebe* is ordinarily applied in cases where the death penalty was always a possibility, but the government delayed filing a formal death notice. Generally, in those cases, the indictment contained death eligible counts, the defendants had learned counsel appointed from the outset, and the government had never represented that it would *not* seek the death penalty. The Fourth Circuit in *Ferebe* acknowledged that even where the government has followed many or most of the proper procedures in a death penalty case, it is still required to provide formal notice a reasonable time before trial so that a defendant may adequately defend himself. This Court is unaware of any other case in which the government has attempted to seek the death penalty at the eleventh hour where no death-eligible charges had been pending, no preparation for a death penalty case had ever occurred, *and* the government had affirmatively represented that it would not seek the death penalty.[2]

---

[2] In the most similar case of which this Court is aware, *United States v. Spurlock*, Crim. No. 23-22, – F. Supp. 3d – , 2025 WL 1360499 (D. Nev. May 9, 2025), the defendant had learned counsel for over a year and the case had proceeded as one where it was possible the government might seek the death penalty. There, as here, the government filed a formal no seek notice and attempted to contravene that representation shortly before trial due to the change in administration earlier this year. The United States District Court for the District of Nevada struck the death notice as untimely, and the government has now voluntarily dismissed its appeal of the ruling.

While this Court relies on *Ferebe*, that case does not tell the full story here. This Court's reasonableness inquiry boils down to whether it is possible to hold a death penalty trial beginning September 2, 2025 that would afford Defendants all of their constitutionally guaranteed rights. The government makes little effort to argue its belated notice can survive *Ferebe*, instead arguing that *Ferebe* should be overruled, and this Court should remedy the belated notice through a continuance. But this Court is bound by *Ferebe*, and accordingly begins with analysis of its four factors.

### a.   Nature of the Charges

Post-*Ferebe*, the Fourth Circuit has not specified how courts are to consider the "nature of the charges presented in the indictment." *Id.* at 737. Two competing approaches have emerged. The first, embraced by the courts in *United States v. Breeden*, 2003 WL 22019060 (W.D. Va. Aug. 22, 2003), *aff'd* by 366 F.3d 369 (4th Cir. 2004) and *United States v. Le*, 311 F. Supp. 2d 527 (E.D. Va. 2004) [*Le I*], asks whether, from a defense perspective, the capital charges are so "complex or atypical" that the days remaining before trial would be insufficient to mount a defense. *Id.* at 534. In *United States v. Hatten*, 276 F. Supp. 2d 574 (S.D.W. Va. 2003), and *United States v. Ponder*, 347 F. Supp. 2d 256 (E.D. Va. 2004), the courts, by contrast, "examined whether the Government should have filed the Death Notice earlier than it did given the nature of the charges in the indictment and the status of the discovery and inspection process." *Id.* at 264. To give independent meaning to each of the four *Ferebe* factors, this Court agrees with the courts in *Hatten* and *Ponder* that it is best to consider the reasonableness of the government's conduct under this prong, and to delay assessment of reasonableness from a defense perspective until the third prong.

In *Hatten*, the court found this factor favored the defendant because there was a substantial delay between the government completing its investigation, filing a superseding indictment, and

filing a death notice. 276 F. Supp. 2d at 578. Essentially, because the government had all information necessary to file a death notice, and nevertheless substantially delayed actually filing such a notice, the court found that the nature of the charges rendered the government's delay unreasonable. *Id.* In *Ponder*, by contrast, the death notice was filed almost immediately after the superseding indictment and was based on newly discovered evidence. 347 F. Supp. 2d at 265. The court found that "the Government acted reasonably; to be more precise, the Government not only acted reasonably, but also solicitously towards the rights of the Defendant by delaying the decision to seek the death penalty until the completion of its discovery and inspection process." *Id.* In *Ponder*, moreover, "[t]he Defendant ha[d] known all along that the death penalty was a possibility and ha[d] conducted [himself] accordingly." *Id.*

This case is more like *Hatten*, although the delay here is even less justified. The government has been aware of the facts underlying this case since 2020. ECF 101-1. The original Indictment, which was filed in November, 2022, echoes those same facts and specifically alleges the murders of Victim 3 and Victim 4 as overt acts. ECF 1. The Superseding Indictment, filed in May, 2025, adds no new factual allegations. ECF 90. The government merely added murder in aid of racketeering charges to an indictment that already had listed the same murders as racketeering acts. The government does not hide the ball here—the only reason for its flip-flop on the death penalty was the change in administration. The government could have included death-eligible counts in the indictment and sought the death penalty from the beginning of this case. It did not. Nothing has changed other than the government's view on the death penalty.

The government agrees that the facts and law at issue are the same now as they were in 2022. But it somehow believes that, because the underlying conduct at issue is the same, Defendants should have no problem preparing for trial by September. The government's willful

13

blindness to the differences between an ordinary trial and a capital trial are startling. On this issue, and throughout its brief, the government neglects to engage with the Defendants' right to learned counsel, the extended jury selection process in capital cases, or the immense work involved in preparing a constitutionally effective mitigation case (among other things). The government contends that its newfound intent to seek the death penalty should be treated like any other superseding charging document.[3] That is not a serious position.

Because the nature of the facts underlying the charges has been the same since the case's inception, and the government has no excuse for its delay, the government's belated death notice is objectively unreasonable. The first *Ferebe* factor favors the defendants.

> b.  *Nature of the Aggravating Factors*

The government raised aggravating factors for the first time in its May 12, 2025 Superseding Indictment and May 16, 2025 Death Notice. Its defense here, essentially, is that "only a few" of the aggravating factors are totally untraceable to the original charges, so it should be no big deal to develop defenses to them before September. ECF 126 at 5. Here, as before, the government's "nothing new" approach only undermines its position. If the government has always been aware of the aggravating factors, why did it wait until now to provide notice of its intent to seek the death penalty? And here, again, the government's position relies on the false premise that a capital trial is the same as any other trial. They are qualitatively different.

The aggravating factors offer the government no excuse for its delay in seeking the death penalty. Again, nothing has changed other than the favorable position of the new administration

---

[3] Of course, even superseding an indictment may not be appropriate on the eve of trial without sufficient justification. The Superseding Indictment in this case has not been challenged at this time, and the Defendants are set to proceed to trial on September 2 on substantive murder charges carrying mandatory life sentences.

regarding pursuit of the death penalty. The Defendants have not had adequate time or notice to prepare defenses to the factors (indeed, as discussed *infra*, the government has not yet produced discovery about them). This second *Ferebe* factor also favors Defendants.

### c. *Period of Time Remaining Before Trial*

On May 16, 2025, only 109 days remained before the fixed trial date of September 2, 2025. There are no other procedural issues in this case that might cause its delay—the only thing that might possibly disrupt the trial date is the government's endeavor to seek the death penalty. "[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable." *Ponder*, 347 F. Supp. 2d at 267; *Le*, 311 F. Supp. 2d at 532 ("[A]n untimely Death Notice cannot be rescued by delaying the trial date."); *Hatten*, 276 F. Supp. 2d at 579 n.4 ("[D]elaying the trial date is not a remedy for an untimely death notice."); *Breeden*, 2003 WL 22019060, at *2 ("[A] court cannot continue a case for the purpose of allowing the government to file a timely Death Notice.").

This Court must consider whether, in light of the circumstances of this case, 109 days is enough time for these Defendants to adequately prepare to be tried for their lives. It is obviously not. Although the *Ferebe* inquiry does not formally consider prejudice, this inquiry into "whether the amount of time remaining before the scheduled trial date is an objectively reasonable amount of time for a defendant to prepare for the capital sentencing phase of trial, given the nature of the aggravating factors and the status of discovery in the proceedings," is essentially a prejudice inquiry. *United States v. Le*, 326 F. Supp. 2d 729, 741 (E.D. Va. 2004) [*Le III*].

During the two and a half years between the indictment and May 16, counsel undertook "no preparation whatsoever for a potential death penalty trial." ECF 101 at 15. Nor should they have—until a month ago, this was not a death penalty case. There was not even an inkling that this

might become a death penalty case until April 2 of this year, more than two years into this case. In most similar cases (or, to this Court's knowledge, *every* similar case), even where the government filed a death notice belatedly, there were death-eligible charges long before a death notice, and thus the government and the defense litigated the case as a potential death penalty case the entire time.

When the Fourth Circuit decided *Ferebe*, more than twenty years ago, the government filed death notices 8.4 months before trial, on average. 332 F.3d at 725. Now, according to the Director of the Capital Resource Counsel, "[t]he average time between the authorization of a capital prosecution and the start of trial is 28 months." ECF 101-4 ¶ 4. And those extended trial-preparation periods, of course, came after pre-notice periods in which defendants had the benefit of learned counsel and knew the death penalty was a possibility.

Significant time is necessary for a defendant to prepare his mitigation case and to prepare to rebut the government's aggravating evidence. None of that has started yet here, nor could it have. Because they have now been "indicted under a statute that carries the death penalty as a maximum sentence," these Defendants have "an absolute right to two attorneys," at least one of whom must be "learned in the law applicable to capital cases." *United States v. Boone*, 245 F.3d 352, 358 (4th Cir. 2001). If this Court allowed this trial to continue without learned counsel, it would be reversible error. *Id.* Defendants do not yet have mitigation specialists or mental health experts—indeed, they do not have any experts who could speak to any mitigating factors. The expectation that these Defendants could start from zero and develop (1) guilt-phase cases to set the scene for a possible sentencing phase case; (2) mitigation cases; and (3) defenses to the government's aggravating evidence in a matter of weeks is unrealistic.

The government omits substantial context in arguing that *Le* was a similar case. *See* ECF 126 at 7 (citing *Le*, 311 F. Supp. 2d at 534–35); *see also id.* (collecting cases). The defendant in *Le* had two lawyers, including one learned counsel, and had never been told the government would *not* seek the death penalty. The government added its capital charges six months before trial. *Le*, 311 F. Supp. 2d at 529–30. Indeed, in no case the government cites did it ever flip-flop from a formal no-seek to a decision to seek the death penalty. And the government cites no case where the defendant lacked learned counsel from the inception. None of those defendants were expected to develop a capital mitigation defense from zero in a matter of weeks; rather, they were simply given the government's formal authorization decision late in the game.

This Court makes no categorical statement about the appropriateness of filing death notices 109 days before a trial. The crux of the issue is whether appropriate preparation has occurred and whether the defendants have had adequate opportunities to defend themselves. Here, 109 days is patently insufficient to develop a capital defense from scratch. This third *Ferebe* factor strongly favors the defendants.

### d. Status of Discovery

When Mr. Constanza-Galdomez filed his motion to strike, and when the government filed its response, it appeared that discovery relevant to the guilt phase had been produced long ago . ECF 101 at 24. However, the government apparently produced approximately 40 gigabytes of additional guilt-phase discovery after Mr. Constanza-Galdomez filed the instant motion to strike. ECF 127 at 10. Although the government disputes some of the context surrounding its belated production, it concedes that the production of guilt-phase evidence continues. ECF 128. While that itself is troubling, this Court is far more troubled by the government's failure to produce *any* evidence relating to the sentencing phase. In particular, the government cites to "victim impact"

as an aggravating factor, but has not provided any clarity or evidence regarding what the victim impact is. Further, the guilt phase of a death-penalty trial provides a critical baseline for a possible later sentencing phase. To prepare for a death penalty trial, counsel would have to essentially redo their review of all of the previously produced evidence, with an eye towards bolstering mitigation arguments and defusing aggravating factors.

No sentencing phase discovery has been produced, nor have the Defendants had reasonable time to conduct their own discovery on mitigation and on defenses to the aggravating factors alleged by the government. The belated guilt-phase production only increases the burden of that task. This factor also favors the Defendants, giving the Defendants a clean sweep of the four *Ferebe* factors.

    2.  <u>Continuance</u>

The government argues that a continuance would resolve any problems with the timeliness of the death notices. Not so. In this Circuit, the only remedy for an untimely death notice is to strike the notice, without any prejudice inquiry. *Ferebe*, 332 F.3d at 731. This Court is aware, however, that other courts have disagreed with the Fourth Circuit's conclusion in *Ferebe*, or have confined its holding to specific factual scenarios. *See, e.g.*, *United States v. Pepin*, 367 F. Supp. 2d 315, 318 (E.D.N.Y. 2005) ("Unpersuasive is *Ferebe's* suggestion that a court may not effectively address the concerns raised by a motion to strike a death notice as untimely by postponing the trial."); *United States v. Wilk*, 452 F.3d 1208, 1224–25 (11th Cir. 2006) ("Allowing continuances after the Death Notice is filed (1) permits the government to receive input from defense counsel and to make the death penalty decision with full and cautious deliberation, while still (2) accomplishing the goal of § 3593(a) to assure that defendants have adequate time to prepare a

defense to the death penalty and do not stand trial for their life without reasonable notice."); *United States v. Williams*, 318 F. App'x 571, 572–73 (9th Cir. 2009) (same).

Even if the Fourth Circuit were inclined to overrule *Ferebe*, postponing this trial would not make these death notices reasonable. First, the notices were filed after CRC proceedings at which the Defendants had not yet been charged with capital offenses and had not had any opportunity to request learned counsel. As the Fourth Circuit explained in *Boone*, learned counsel play a crucial role in death penalty authorization processes. 245 F.3d at 360. And here, of course, that CRC process also occurred without any meaningful opportunity for defense counsel, learned or not, to develop or present a mitigation case. Because the government had represented to Defendants that it would not seek the death penalty, counsel had no reason to investigate or develop such a case. Only three weeks elapsed between the government's first indication that it might change positions and the CRC meeting for these Defendants. Without a superseding indictment, moreover, counsel did not have notice of the specific capital charges the government was considering, nor of the special sentencing factors that might be pursued.

More importantly, this Court would also decline to grant a continuance because delaying this trial solely to accommodate the government's flip-flopping would implicate the Defendants' constitutional speedy trial rights. A defendant's speedy trial rights are violated where he can "show that, on balance, four separate factors weigh in his favor." *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir. 1995). The Supreme Court laid out those factors in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and

prejudice to the defendant." If this Court were to continue the trial, Defendants would have strong arguments to make on all four factors.[4]

A delay exceeding one year is "presumptively prejudicial," and this federal case is already nearly three years old. *Doggett v. United States*, 505 U.S. 647 (1992). To be sure, this is a complex case and its current timeline is not unusual. But any additional delay to accommodate the government's change in position would exacerbate an already significant delay occasioned by the complexity of the charges and the length of the trial. Any such continuance would be solely attributable to the government, and likely improper because the government did not act proactively in its charging decisions. Any continuance for the purpose of preparation for a capital trial would necessarily be lengthy and, in their motion to strike, Defendants have now asserted their speedy trial rights. Perhaps most significantly, these Defendants have been in (state and federal) custody since 2020 awaiting trial on the charged events. The anxiety they have experienced is no doubt significant given the government's abrupt change in position. And it is at least possible that some evidence relating to mitigation could be lost because there was no reason to preserve it for five years.

\*    \*    \*

In sum, the government's notice of its intent to seek the death penalty was untimely. This case presents an unusual and extreme situation because the government has directly contravened its prior representations to the Defendants and this Court. The government asks this Court to treat its belated attempt to seek the death penalty like any other change in a charging document. This Court will not cast aside decades of law, professional standards, and norms to accommodate the

---

[4] This Court, of course, is not reaching a constitutional issue that is not ripe for decision. But the obvious constitutional ramifications that would result from any continuance are material when considering whether a continuance could effectively cure the untimely death notices here.

government's pursuit of its agenda. Of course, elections have consequences, and this administration is entitled to pursue the death penalty in cases where it can do so in accordance with constitutional and statutory requirements. But this is not one of them. The death notices in this case must be struck, and a continuance would not render them appropriate.

    3.  <u>Amendment of the Notice and Estoppel</u>

Defendants contend, in the alternative, that this Court should strike the death notices because (for two different reasons) the government should be bound by its prior representation that it would not seek the death penalty. This Court agrees that general principles of judicial estoppel and the more specific guidelines found in Section 3593(a) also preclude the government from reversing its position here.

    a.  *Amendment of Death Notice*

Section 3593(a) allows the government to amend a death notice "upon a showing of good cause." In this context, "good cause must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained." *United States v. Le*, 316 F. Supp. 2d 343, 349 (E.D. Va. 2004) [*Le II*]. If there was good cause, the Court then must assess whether the Amended Notice was untimely.. *Le III*, 326 F. Supp. 2d at 741.

The statute seems to contemplate a less dramatic change than the one in this case—the true amendment of a pre-existing death notice. The government insists that the statute does not say anything about a new death notice, even if a change in position, and that the government is not required to have good cause to entirely change its mind. True, it is a little dismissive to refer to the momentous switch from a formal no-seek notice to a death notice as a mere "amendment." But the purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a

death notice when there is good cause to do so. If Congress is concerned by the lesser, surely it would also be concerned with the greater. This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case.

Here, the government did not have good cause. The government does not even try to argue it was diligent, or that it had some legitimate reason for seeking the death penalty so late and contravening its own express statements. Rather, it argues it should not have to honor its representation that it would not seek the death penalty because it was not the product of an agreement. It also argues that this Court should grant *the government* the Court's own "inherent power" to "reconsider" its positions. ECF 127 at 9. Both positions have serious problems, and neither justifies the government's conduct.

When the government comes before a court, it does so as a litigant. Litigants do not enjoy a *court's* inherent powers. And litigants, of course, are not empowered to contravene their express representations to a court without good reason. The government possesses no special authority to go back on its word to a court. If anything, the government's special position comes with the obligation to "turn square corners in dealing with the people." *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020). To say to these Defendants, whose lives are at stake, "'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970).

As this Court already found above, the government's death notices were untimely. And because the government has not offered any good cause for its change in decision, but rather argued that the rules should not apply to it, it has not shown good cause either. The government violated Section 3593(a) in amending the death notices without good cause.

b.   *Judicial Estoppel and Waiver*

Mr. Constanza-Galdomez next argues that the notices should be struck because the government waived its right to seek the death penalty, and three forms of estoppel should bar it from changing course.

As to waiver, this Court would not go as far as Defendants ask it to. Although this Court believes that, for a whole host of reasons, the government's change in position in this case was improper, it does not believe that the government could *never* reverse a prior no-seek. Section 3593(a) expressly contemplates that "good cause" could justify the modification of a death notice so long as it is timely. It is not hard to imagine some circumstance where reversing a prior no-seek decision could be proper. For example, the government could discover substantial new evidence while a case was pending that it was unaware of before CCS proceedings. This Court need not define those bounds in this case, but declines to find that the government automatically waived its right to seek the death penalty by filing a no-seek.

Defendants' case-specific arguments about judicial estoppel are more convincing. In *Spurlock*, the court found "that the principles of judicial estoppel preclude the government from reversing its formal, timely-filed…No-Seek notice, especially where no case-related developments occurred following the July Notice to bear on the reversal decision." *Spurlock*, 2025 WL 1360499, at *17. The Supreme Court laid our three factors for courts to consider in *New Hampshire v. Maine*, 532 U.S. 742 (2001): (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) a court must "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and

(3) a court must ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

All three of those factors favor applying judicial estoppel here. A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration. *Cf. Spurlock*, 2025 WL 1360499, at *18 ("The Court has…adopted and relied on the July 2024 No-Seek Notice in…explicit and implicit ways,…throughout the eight months since that decision, including by…addressing pretrial timing and motions with a scheduled noncapital trial in mind."). Finally, and most concerning to this Court in this case, allowing the government to reverse course would impose an unfair detriment on the defense. Like the defendant in *Spurlock*, the Defendants in this case have relied on the government's no-seek decision—and that they were not charged with death eligible counts—in preparing for trial for over two years. They "would have litigated this case very differently" had the death penalty been on the table. ECF 101 at 39. At every step, preparation for a death penalty trial differs from preparation for an ordinary criminal trial. Because this case proceeded without even an inkling that it might become a death penalty case until April of this year, these Defendants have not had any opportunity to mount a defense. Their counsel have represented that, at least, their decisions regarding consenting to speedy trial exclusions and plea negotiations would have been different.

This Court accordingly finds that, under these circumstances, judicial estoppel also bars the government from seeking the death penalty.[5]

---

[5] Mr. Constanza-Galdomez also argues that the government should be barred from seeking the death penalty under the doctrines of equitable and promissory estoppel. Having already found another estoppel doctrine applies, this Court makes no ruling on equitable or promissory estoppel.

## III.  CONCLUSION

Here, like in *Spurlock*, "the government decided—certainly not by inadvertence or accident —to reverse course on an issue of critical importance, involving [the Defendants' lives],…with full knowledge that the reversal would have a chaotic impact on the progression of this case." *Spurlock*, 2025 WL 1360499, at *20. The government cannot play "fast and loose" with decisions involving life and death. *Id.* Despite the government's repeated assertions to the contrary, our legal system has always recognized that death is different. We demand the most from the government when it seeks to impose an irrevocable penalty. Again, this Court draws no brightline rules about when the government can and cannot change its mind about seeking the death penalty. But it would be impossible to provide these Defendants with a capital trial that upholds their constitutional and statutory rights—in September, or ever.

Courts are constitutionally required to intervene when the government oversteps its bounds. It has done so here. If the government cannot provide these Defendants with a capital trial that preserves their rights, this Court will not hold one. The motion to strike is granted, and this case will proceed to a non-capital trial on September 2, 2025. A separate order follows.


Dated: June 18, 2025                                                    /s/
                                                           Stephanie A. Gallagher
                                                           United States District Judge

---

He also raises three separate constitutional issues, which this Court need not reach given the multitude of statutory justifications for striking the death notices in this case. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other grounds upon which the case may be disposed of."); *United States v. Chatrie*, 136 F.4th 100, 101 (4th Cir. 2025) (Diaz, C.J., concurring) ("[J]udicial modesty sometimes counsels that we not make grand constitutional pronouncements merely because we can."). This case raises obvious constitutional concerns, particularly as to the Due Process Clause. But insofar as this Court can decide this issue on statutory and estoppel grounds, it declines to make "grand constitutional pronouncements." *Id.*